Argued and submitted March 10, reversed and
remanded for new trial May 19, 1980

# TAYLOR,
## *Respondent,*
### *v.*
# GAUDRY,
## *Appellant.*

## (A7711-15704, CA 15157)

611 P2d 336

Howard R. Hedrick, Portland, argued the cause for appellant and filed the briefs for appellant. With him on the briefs was Dana R. Taylor, Portland.

Mark McCulloch, Portland, argued the cause and filed the brief for respondent. With him on the brief was Powers & McCulloch, Portland.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges, and Tongue, Judge Pro Tempore.

CAMPBELL, J.

## CAMPBELL, J.

This is an action at law by the plaintiff real estate broker to collect a commission. The defendant has appealed from a judgment entered on the trial court's order directing a verdict for the plaintiff. We reverse and remand for a new trial.

In January 1977, the defendant listed for sale with plaintiff a restaurant and lounge business on N. E. Halsey in Portland known as "The Keyhole." The business was located on leased premises. The defendant stated in the listing agreement that he had a five-year lease with an option for an additional five years. The agreement further provided "seller to approve buyer as to business qualifications."

In March 1977, the plaintiff submitted to the defendant an offer in the form of an earnest money receipt executed by R. S. McKee and Constance McKee, husband and wife, and Eunice V. Cross[1] to purchase the business. Under the heading "special terms and conditions," the offer contained the following language:

> "Subject to, (1) approval by OLCC of DA license (2) assignment of present lease of approx 5 years at $1289.00 per mo plus cost of living increases and an additional 5 yr option with rental to be negotiated."

The defendant did not accept the offer, but made a counter-offer:

> "Selling price of $175,000 with $25,000 down date of closing and an additional $15,000 cash payable 90 days from closing. The balance of $135,000 payable in monthly payments of not less than $1674 including interest at 8-1/2% per annum. First payment starts 30 days from closing."

The counter-offer form contained the following printed language:

---

[1] Eunice V. Cross was the mother of R. S. McKee.

"Any part of buyer's original offer not hereinabove changed, altered or modified hereby is approved and accepted by the seller; * * *."

The McKees and Cross accepted the counter-offer. Neither the offer nor the counter-offer carried forward the provision of the listing agreement, "seller to approve buyer as to business qualifications."

The sale was not completed. In December 1977, the plaintiff filed his amended complaint alleging that in accordance with the listing agreement he had produced purchasers who were ready, willing, and able to purchase the defendant's business and that the defendant owed him a commission in the amount of $17,500. The defendant filed an answer containing a general denial and affirmative defenses, including a defense that he had not approved of the buyers' business qualifications.[2]

The reply affirmatively alleged that the defendant had waived his right to approve the business qualifications of the purchasers by entering into the earnest money agreement with the purchasers.

---

[2] The trial court consolidated two of the defendant's affirmative defenses. These defenses alleged that at the time of and prior to the offer to purchase the defendant showed the plaintiff a lease and informed the plaintiff that the defendant was a lessee and not the owner of the business. (In his brief in this court the defendant claims the lease referred to was a sublease from his parents.) The defense further alleged that the plaintiff was an experienced broker, had a duty to advise the defendant that the defendant could not enter into a binding agreement, and that the plaintiff is now estopped to claim a fee for a commission.

The defendant warranted in the listing agreement that he was the sole owner of the business and that he held a five-year lease with an option for an additional five-year period.

The offer by the purchasers in the earnest money agreement was subject to "assignment of present lease of approx. 5 years at $1289 per mo. plus cost of living increases and an additional 5 yr option with rental to be negotiated." This condition was made a part of the agreement by the acceptance of the counter-offer.

The lessor was the Bank of California, Trustee. The undisputed evidence showed that the lease was in the names of Paul Gaudry and Irene Gaudry, the parents of the defendant. The lease had only 19 months to run.

The case was tried before a jury. At the conclusion of the testimony the plaintiff moved for a directed verdict. The trial court granted the plaintiff's motion and ordered the jury to enter a verdict for the plaintiff in the sum of $17,500. The trial court in effect found that the undisputed facts showed that (1) the plaintiff had produced purchasers who were ready, willing, and able to buy on terms fixed by the defendant; (2) the purchasers entered into a binding contract with the defendant to buy; and (3) the purchasers were prevented from closing the transaction by the wrongful acts and interference of the defendant.[3]

The defendant has assigned as error the granting of the plaintiff's motion for a directed verdict, and the exclusion of certain evidence.

The Oregon Supreme Court in *Setser v. Commonwealth, Inc.,* 256 Or 11, 19-21, 470 P2d 142 (1970), set out the requirements for a real estate broker to recover a commission:

The bank would only give a new lease to the defendant's parents. A new lease was not executed.

The defendant's brief in this court states:

"At the close of plaintiff's case in chief, defendant moved for a non-suit on the ground that plaintiff failed to offer evidence that the purchasers satisfied or could satisfy the condition precedent of obtaining a lease extension."

The defendant's first assignment of error is the failure of the trial court to grant his motion for involuntary nonsuit.

The defendant cites no authority to show that he is entitled to rely upon the consolidated affirmative defense set forth above. A review of the plaintiff's evidence set forth later in this opinion shows that the plaintiff presented a prima facie case allowing him to go to the jury.

It was not error to deny the nonsuit. We will not confuse this opinion by any further discussion of the lease, the above affirmative defense, or the motion for nonsuit.

[3] The plaintiff's witnesses testified that the Oregon Liquor Control Commission would not approve the transfer of the liquor license because the defendant would not give the Commission a letter that he intended to sell The Keyhole business.

" 'It has been held that even if the seller accepts the offer of the buyer procured by the broker, that in itself is not sufficient to create a legal obligation upon the part of seller to pay the broker's commission. The cases so holding reason that there should be no recovery when the transaction is not consummated as a result of the buyer's failure to complete it. It is felt that the owner of property who employs a broker to procure a purchaser bargains not simply for the presentation of a person who is willing to sign a contract, but one who is able and willing to complete the sale transaction.

' "'* * * * * The leading case in the United States adopting this point of view is *Ellsworth Dobbs, Inc. v. Johnson,* 50 NJ 528, 236 A2d 843, 30 ALR3d 1370 (1967). In that case the prospective purchaser had entered into a contract of purchase with the owner but did not complete the contract because he was financially unable to do so. The court said:

' "'* * *

' " '* * * When a broker is engaged by an owner of property to find a purchaser for it, the broker earns his commission when (a) he produces a purchaser ready, willing and able to buy on the terms fixed by the owner, (b) the purchaser enters into a binding contract with the owner to do so, and (c) the purchaser completes the transaction by closing the title in accordance with the provisions of the contract. If the contract is not consummated because of lack of financial ability of the buyer to perform or because of any other default of his, * * * there is no right to commission against the seller. On the other hand, if the failure of completion of the contract results from the wrongful act or interference of the seller, the broker's claim is valid and must be paid. In short, in the absence of default by the seller, the broker's right to commission against the seller comes into existence only when his buyer performs in accordance with the contract of sale.' " (footnotes omitted)

*See also Sipe v. Pearson,* 276 Or 715, 556 P2d 654 (1976); *Woodworth v. Vranizan,* 273 Or 111, 539 P2d 1055 (1975); *Red Carpet Real Estate v. Huygens,* 270

Or 860, 530 P2d 46 (1974); *Boyce v. Standard Investment Co.,* 263 Or 82, 501 P2d 65 (1972); *Wright v. Schutt Construction,* 262 Or 619, 500 P2d 1045 (1972); *Brown v. Grimm,* 258 Or 55, 481 P2d 63 (1971).

The plaintiff's witnesses testified that the defendant's business, known as The Keyhole, was shown to the McKees and Cross by Martin F. May, an associate broker for the plaintiff. May presented the offer of the McKees and Cross to the defendant, and explained to the defendant the business background of the prospective purchasers. The defendant indicated that "they look okay" but a bigger cash down payment was needed. The defendant made the counter-offer which was accepted. The purchasers were anxious to go forward and close the transaction. A proposed agreement for the sale of the business was signed by the purchasers at the office of the escrow attorney. The purchasers' portion of the application to the OLCC was approved and accepted. The defendant did not sign the proposed agreement for the sale and did not submit a letter of intent to sell to the OLCC. The purchasers collectively had "in the neighborhood of over $40,000" cash.

At the time of the trial the purchasers owned a different restaurant and lounge on which they had made a down payment in the amount of approximately $62,000 and had an inventory of over $5,000. R. S. McKee had operated his own trucking business. Eunice V. Cross had many years of experience in the food and liquor business.

The defendant testified that the purchasers did not have enough cash based upon their financial statements to close the sale. The purchasers' financial statements to the OLCC were received in evidence as defendant's exhibits. The McKees listed as assets $7,350 cash and bank accounts, $6,500 cash value of life insurance, $7,500 vehicles and household property, and $29,000 truck and trailer. They listed a note payable in the amount of $5,415, giving them a net

worth of $44,935. Eunice V. Cross listed as assets $21,300 in Colorado bank accounts, $5,000 cash value of life insurance, $10,000 of vehicles, city lots valued at $10,000, a $15,000 home, and $6,000 worth of furniture, for a total net worth of $67,300.

On the plaintiff's motion for a directed verdict against the defendant, the motion admits the truth of the defendant's evidence and every inference of fact that may be drawn from the evidence, and the evidence must be interpreted in the light most favorable to the defendant. *Carey v. Hays,* 248 Or 444, 446, 434 P2d 331 (1967). If reasonable minds can differ as to the inferences to be drawn from the evidence, the motion will be denied. *Resser v. Boise-Cascade Corporation,* 284 Or 385, 587 P2d 80 (1978).

Assuming for the sake of argument the testimony was uncontradicted that the plaintiff had produced purchasers who were ready, willing and able to buy, we still must take into consideration the rules of law in *Rickard v. Ellis,* 230 Or 46, 51-2, 368 P2d 396 (1962):

"In some cases an issue upon which there is uncontradicted testimony is properly submitted to the jury; on the other hand in some cases the question of the credibility of a witness is properly withheld from the jury. The correct principle is stated in *Ferdinand v. Agricultural Insurance Co.,* 22 NJ 482, 126 A2d 323, 62 ALR2d 1179 (1956), which was adopted and applied in *Wiebe v. Seely, Administrator,* 215 Or 331, 343-344, 335 P2d 379 (1958):

' " '* * * Where men of reason and fairness may entertain differing views as to the truth of testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such a character is for the jury. * * * [citing cases] But when the testimony of witnesses, interested in the event or otherwise, is clear and convincing, not incredible in the light of general knowledge and common experience, not extraordinary, not contradicted in any way by witnesses or circumstances, and so plain and complete that disbelief

of the story could not reasonably arise in the rational process of an ordinary intelligent mind, then a question has been presented for the court to decide and not the jury. * * * [citing cases] ' " '

"It is evident from the foregoing statement of the principle that whether uncontradicted testimony is such as to preclude the jury's function in testing the credibility of the witness or witnesses who gave it will depend upon the nature of the issue in the particular case which the testimony purports to resolve. Two important factors in determining whether the jury should be permitted to disbelieve the witness and draw an inference contrary to the uncontradicted testimony given are (1) the availability of evidence to contradict the witness's statement, and (2) the likelihood that the witness's interest in the litigation may tempt him to testify falsely." (footnote omitted)

We find that reasonable minds could draw different inferences from the testimony as to the purchasers' financial ability to close the sale and to make the monthly installments due on the balance of the purchase price.[4]

Under the factors in *Rickard v. Ellis, supra,* the jury should have been given the opportunity to disbelieve the evidence and witnesses and draw a contrary inference because of the likelihood that the interests of plaintiff's witnesses in the litigation might tempt them to testify falsely.[5]

---

[4] In an action to recover a real estate broker's commission the court in *Martin v. Clinton,* 239 Or 541, 543, 398 P2d 742 (1965), held:

"Plaintiff must show the proposed purchasers had the ability not only to make the down payment but the installment payments as well."

The purchasers would need a down payment of $25,000, an unknown amount to buy the inventory and pay for other prepaid items, an additional payment of $15,000 within 90 days, monthly installments of $1674, and monthly rent of $1289.

[5] We refer to the plaintiff, his associate broker Martin F. May, and R. S. McKee. The testimony showed that R. S. McKee was a party plaintiff to an action for damages pending against the defendant.

We conclude that whether or not the plaintiff produced purchasers ready, willing, and able to buy on terms fixed by the defendant is a question of fact and should have been determined by the jury. It follows that it was error to direct a verdict in favor of the plaintiff. The case must be remanded for a new trial.

We discuss only the remaining evidentiary questions which are virtually certain to arise at the new trial.

Three of the defendant's assignments of error concern rulings of the trial court in excluding evidence of the defendant's right to approve the buyers' business qualifications. This is a different question from whether or not the buyers were ready, willing, and able. The defendant is referring to the listing agreement with the plaintiff wherein it was provided "seller to approve buyer as to business qualifications." This provision of the listing agreement was not incorporated into the earnest money agreement or the counter-offer. The two latter instruments construed together were a new agreement. The new agreement was signed by the plaintiff, defendant, and the three purchasers. The construction of a contract is a question of law for the court. *Quillin v. Peloquin,* 237 Or 343, 346, 391 P2d 603 (1964). The new agreement was complete. From the standpoint of being complete and definite it could have been specifically enforced by either the seller or the buyers if the conditions as to the OLCC license and the lease of the premises had been fulfilled. The purchasers had no notice of any further condition. The trial court did not err in excluding the evidence which was offered.

One of the defendant's remaining assignments of error contends that the trial court erred "in refusing to permit defendant to introduce evidence on how much additional cash a purchaser would need in order to open the business." The earnest money receipt provided "saleable inventory and prepaid items extra for

[244]

cash, at cost, at time of closing." Evidence of the requirement of additional cash at the time of closing was relevant to bear upon the question of whether or not the purchasers were ready, willing, and able. The evidence should have been admitted.

Reversed and remanded.